Filed 9/2/16  P. v. Vilkin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D067753 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN317326) |
| MICHAEL VILKIN, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.


Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Vilkin was charged by information with murder (Pen. Code,[1] § 187, subd. (a); count 1) and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). As to count 1, the information further alleged defendant personally discharged a firearm (i.e., a revolver), proximately causing great bodily injury or death (§ 12022.53, subd. (d)). As to count 2, the information also alleged defendant personally used a firearm in the commission or attempted commission of this offense (§ 12022.5, subd. (a)).

A jury found defendant guilty as charged and found both firearm enhancement allegations true. The court sentenced defendant to prison for a total term of 64 years to life, calculated as an indeterminate term of 25 years to life on count 1 with a consecutive 25 years to life for the gun enhancement, and a consecutive determinate term of four years on count 2 with a consecutive 10 years for the gun enhancement.

On appeal, defendant contends that there is insufficient evidence in the record to support his murder conviction on count 1; that he was deprived effective assistance of counsel when the defense did not move for a mistrial after the prosecution elicited testimony from a defense expert that the "fight or flight syndrome" was a "fad"; that the court improperly instructed the jury with CALCRIM No. 3472 regarding "contrived self-defense" and his counsel was ineffective for failing to object to said instruction; and that the cumulative effect of these alleged errors allegedly prejudiced him, requiring reversal of his conviction and a new trial.

As we explain, we disagree with each of these contentions. Affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

## FACTUAL OVERVIEW[2]

A. *Background*

In 2008, defendant purchased a two-and-a-half-acre undeveloped lot on Lone Jack Road in Encinitas (lot). Defendant planned to get a construction loan, build on the lot and sell it in the future. Defendant spent about five or six days each week, usually between about 3:00 to 8:00 p.m., working on, and clearing, the lot. Defendant allowed his neighbors to use the lot to walk their dogs and park their cars.

Witness John Bonanno testified that, in 1996, he bought a home on Lone Jack Road that was adjacent to the lot subsequently purchased by defendant. An easement ran across a private road on defendant's lot, which allowed neighbors to access their homes.

B. *The Prosecution*

In April 2011, Bonanno rented his home to murder victim John Upton (count 1) and his girlfriend, Evelyn Zeller (count 2). Although Bonanno did not know Upton or Zeller when they initially rented from Bonanno, Bonanno and Upton became friends as time went on.

Bonanno met defendant in 2010. Bonanno described their meeting as cordial, as defendant was then in the process of clearing the lot and attempting to smooth it out after

---

2 We view the evidence in the light most favorable to the judgment of conviction, to the extent there is a conflict in the evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Certain portions of the factual and procedural history related to defendant's claims of alleged error are discussed *post*, in connection with those issues.

a landslide had occurred on a portion of the lot in 2005. Bonanno estimated he came in contact with defendant in total about six times.

On one occasion in the fall of 2012, after Upton and Zeller had moved in, Upton called Bonanno early on a Saturday morning and asked Bonanno to speak to defendant because Upton thought defendant was on Bonanno's property, and, despite Upton's pleas, defendant "just [would not] . . . stop cutting bushes and chopping things up into little sticks." When Bonanno arrived, he and Upton spoke to defendant.

According to Bonanno, Upton pleaded with defendant to be finished clearing the lot. Upton suggested defendant obtain a permit and build on the lot, or sell it, but reiterated to defendant his constant cutting and chopping of shrubs on the lot was driving Upton "nuts." Bonanno testified defendant responded he was "done," "finished," clearing the lot.

Bonanno described Upton's demeanor as "elevated" during what Bonanno estimated was about a 10-minute conversation. According to Bonanno, defendant was "visibly angry" during this exchange and was repeatedly clinching his fist while holding a shovel in his other hand. Defendant also moved closer to Upton and Bonanno during this conversation. At one point, defendant was about six to eight feet away. Neither Bonanno nor Upton approached defendant, however.

As Upton and Bonanno started walking back to Bonanno's house, defendant attempted to discuss a road defendant wanted. Bonanno responded that defendant needed to speak to the "city" about the road; that it was his understanding the city would never

4

allow such a road; and that defendant was going to need a permit and approval from the city if defendant wanted a road.

San Diego County Deputy Sheriff Scott Hill testified that he spoke to defendant by telephone on October 31, 2012 when defendant inquired "about the specifics of the law in regards to carrying and use of a firearm." Defendant told Deputy Hill he wanted this information because defendant "was having a property dispute with a neighbor." Specifically, defendant told Deputy Hill he "was developing a property and he wanted to put in a driveway and the neighbor was complaining that the proposed driveway would necessitate the removal of some vegetation that he had planted—or that was planted."

On questioning, defendant told Deputy Hill he had not been threatened and his neighbor had "not taken any aggressive action towards him." Given the nature of defendant's inquiry about carrying a gun, Deputy Hill was concerned of the potential for violence between defendant and his neighbor. Deputy Hill testified that, based on this conversation, there was "no articulable reason" defendant could provide regarding why he was "so greatly concerned" for his safety and why he "had gone to the steps of purchasing a firearm and want[ing] to carry it."

As summarized *post*, defendant purchased two guns to "protect" himself from Upton. Defendant in August 2012 purchased a .22 revolver. Defendant did so because, in his view, Upton's behavior was "bad enough to cause [defendant] to call the Sheriff Department" and because the sheriff's department "refused to help [defendant]." Defendant in about October 2012 purchased a .44 Rugar after he did "some research on

5

the Internet" and determined that a .22 revolver was "simply not a serious weapon" and would "not stop a big guy" like Upton.

During their telephone conversation, Deputy Hill also told defendant that he was not allowed to give any legal advice. When defendant gave Deputy Hill several legal reasons based on "research" defendant had done as to why he was justified in carrying "his firearm" on the lot, Deputy Hill suggested defendant contact a lawyer. Unsatisfied with Deputy Hill's response, defendant repeated that he had done research which showed defendant was allowed to carry a firearm on his own property. Deputy Hill reiterated he was not allowed to give legal advice and also warned defendant that it was a "very bad idea to carry a firearm . . . when you're expecting an argument, especially when there are no threats made," and that defendant could end up being "arrested" and "charged with a crime" if he made a "bad choice."

About a week later, defendant approached Deputy Hill and his partner after the deputies were finishing a call at an apartment complex in Encinitas near defendant's home. Deputy Hill testified defendant started asking his partner the "same questions" he had asked Deputy Hill over the phone, after relaying the "same information" defendant had previously given Deputy Hill. Deputy Hill testified he told defendant during this second contact that he was the deputy that defendant had spoken to a week earlier. According to Deputy Hill, defendant "wanted to be told it was okay to carry a firearm." In response, Deputy Hill told defendant "a second time" that deputies were not permitted to give legal advice and recommended defendant contact a lawyer.

6

Witness Vince Sampo testified that, toward the end of 2012, defendant hired him to survey the lot, locate any missing monuments, determine if there was a potential encroachment on the lot and mark the boundaries of the lot in connection with defendant's desire to construct a road. After visiting the lot in November 2012, Sampo asked defendant to remove about three feet of vegetation in an area where Sampo had been digging in an effort to locate specific monument markers.

Sampo testified that, while he was on the lot in November 2012, defendant escorted him to defendant's open car trunk and said, " 'I have this gun,' " while showing Sampo what Sampo described as a long silver pistol in a case. Defendant then told Sampo that he had purchased the gun because "he was threatened by the neighbor" and that he "would rather spend [his] life in prison than . . . get blown away or get shot," or words to that effect. Sampo testified that he was frightened and uncomfortable when defendant showed him the gun.

San Diego County Deputy Sheriff Marshall Abbott testified he was dispatched to the lot on March 21, 2013. On contact, defendant told Deputy Abbott he called the sheriff's department because his surveyor, who was on the lot working, needed some brush cleared and defendant wanted to avoid a "confrontation" with his neighbor Upton. Defendant told Deputy Abbott he felt "threatened" by Upton. When Deputy Abbott asked defendant to provide examples of how Upton had threatened him, defendant stated that Upton had "yelled at him" and that they had "some arguments about cutting down brush." Deputy Abbott testified that he did not consider such conduct by Upton to be a

7

"criminal kind of threat" and that defendant then denied any physical contact had taken place between him and Upton.

Deputy Abbott next contacted Upton and asked him to move a vehicle that was parked on the easement, at the request of the surveyor. Upton complied. According to Deputy Abbott, Upton was calm but frustrated. Upton told Deputy Abbott that defendant kept cutting trees and shrubs in the area when defendant did not have the money for a road.

Deputy Abbott testified he told Upton to call the sheriff's department if there was a problem with defendant and to avoid a physical confrontation. Upton agreed. As Deputy Abbott and Upton spoke, defendant slowly approached and made a statement or comment that upset Upton. Upton in response stated, "Don't come any closer to me you fucking asshole," or words to that effect. Deputy Abbott diffused the situation and reiterated both to Upton *and* defendant they should avoid anything physical and instead call him and/or the sheriff's department.

Zeller testified Upton was her life partner, and they had been together for about two and a half years before the shooting. Zeller had a few contacts with defendant that did not include Upton. On a couple of those occasions, Zeller expressed her opinion that it made no sense for defendant to remove the vegetation on the lot and make it a "dirt hill" because, previously, there had been a landslide on the lot which had damaged several surrounding properties, including the property she and Upton shared. Defendant in response told Zeller he could do what he wanted on his property.

8

Zeller recalled an interaction between Upton and defendant that took place in November 2012. In the middle of the night while Zeller was sleeping, Upton heard some noise outside and saw defendant pruning some trees near their front door using a car headlamp as a light. Upton went outside and asked defendant not to prune the trees and bushes that were healthy and that provided a privacy screen for Upton and Zeller. According to Upton, who relayed the story to Zeller the following morning, defendant and Upton shook hands after defendant agreed only to trim the "dead branches."

The next morning, Upton and Zeller awakened to find all the trees and bushes in the area where defendant had been working the night before "cut down to the ground," leaving only stumps. That afternoon, while walking their dogs, Upton and Zeller contacted defendant. Zeller described Upton as upset, and Upton yelled at defendant: " 'What are you doing? We had an agreement, what are you doing?' " According to Zeller, defendant also was upset and yelled back in response: " 'Fuck you, get the fuck off of my property. You can't stop me. I can do whatever I want.' " Defendant did not appear frightened or intimated by Upton, as Zeller noted defendant "stood his ground"; "yelled back"; "didn't retreat"; and continued to "do what he was doing." Zeller estimated there were two or three similar interactions between Upton and defendant while they lived adjacent to the lot.

Zeller testified that on March 21, 2013 (i.e., a week before the shooting), a sheriff's deputy came to their home. That day, Zeller heard Upton and defendant arguing. They were standing about 15 to 20 feet apart. Zeller recalled Upton yelling, " 'Sheriff,

9

can't you stop, [defendant]? What he does is not making any sense, he's cutting things down. He will never be able to build a road.' " Zeller heard defendant say in response, " 'I can do whatever I want, it's my property. You won't stop me. Fuck you.' " Zeller noted Upton was also cussing. However, Zeller testified Upton did not threaten defendant, such as saying, " 'I'm going to fucking kick your ass,' " or words to that effect.

In any event, while the sheriff's deputy was at the location on March 21, Zeller heard Upton tell the deputy, " 'I will not touch [defendant], you do not need to worry, I promise you, I'm not stupid, I won't touch [defendant]. You can go.' "[3] After the sheriff's deputy left, defendant along with two of his workers continued for "hours" to cut down vegetation on the lot.

Zeller testified that, after they went back into the house following the March 21 incident, she reminded Upton that they were closing escrow in a few weeks on a new house; that they did not own the residence adjacent to the lot; and, thus, that it was not worth "getting worked up over" defendant's continued cutting of bushes and shrubs on the lot. A day or two later, Upton asked Zeller to inform defendant they were moving in two weeks. Although Zeller saw defendant working on his lot the next day, she did not speak to him because defendant made her uncomfortable.

---

3    The record shows the court, outside the presence of the jury, confirmed with both counsel they were each making a "tactical decision" to let in a great deal of hearsay evidence in the trial. Although the court offered to give the jury a limiting instruction, both counsel declined.

Zeller testified that several months before Upton was killed, Upton showed her a gun. Until then, Zeller did not know Upton owned a gun. Zeller told Upton to get rid of it because she was afraid of guns.

On March 28, the day of the shooting, Upton awakened Zeller about 6:00 a.m. Because it was Zeller's birthday, Upton wished her a happy birthday and then told Zeller his mother had passed away in her sleep about three hours earlier after a long illness. Zeller testified Upton was relieved his mother had passed and his mood was happy, not somber.

About 9:00 a.m., as Zeller was walking up some stairs to talk to Upton, she heard two "loud and sharp bangs" that she estimated were about five to seven seconds apart. Initially, Zeller did not know they were gunshots. However, when she called out for Upton and got no response, she got a "doom feeling in [her] chest."

Zeller testified she went outside and saw defendant about 25 feet away talking on his phone. When Zeller asked defendant what those sounds were, defendant acknowledged her and then walked behind some bushes out of sight. Zeller next saw two workers defendant had hired running down the street. Zeller in Spanish yelled, " 'What happened?' " One of the workers yelled back in English, " 'I don't know, but it came from over there,' " while pointing up a path. When she walked up the path, Zeller saw Upton's body lying on the ground. A few seconds later, she heard defendant say, " 'Don't get any fucking closer.' " When she looked up, Zeller saw defendant standing about eight feet

11

away, pointing a "big revolver" at her. Defendant was holding a gun case in the other hand. Stunned, Zeller threw her hands into the air, waited, and then ran into the house.

Zeller testified that, as defendant pointed the gun at her, his demeanor was "very sharp and clear"; that he did not appear afraid or scared; that he did not show signs of being under "exorbitant stress"; and that, instead, he was "calm and composed." Zeller felt her life was then in danger. After running in the house, Zeller called 911.

Witness Macario Mendoza Matias testified that he was one of the two workers defendant had hired to work on the lot on March 28; that he had worked for defendant on the lot a week earlier; that, when they arrived at the lot about 8:30 a.m. on the day of the shooting, defendant told them he had a gun; and that defendant instructed him that if a person or dog came out of the house near where they were trimming the trees, defendant would go " 'talk to them.' " Matias noticed defendant was carrying a black case. After defendant instructed them what to cut, defendant went a distance away, although Matias could still see defendant. Matias testified that, as he cut the tree branches, he was worried the branches would fall on the cars located nearby.

While working, a man later identified as Upton came out of the house and said "Hello" to Matias. Matias said the man had a little dog with him. The man next asked Matias if he intended to cut all the branches from the trees. After responding " 'Yes,' " the man told Matias he was going to move the cars. According to Matias, the man was about 20 to 30 feet away when they had this short conversation. Matias testified the man

12

was calm during their conversation; he was not yelling or cursing and did not seem angry. In addition, Matias did not see the man with anything in his hands.

Matias testified that the man next started walking up the hill, toward defendant. Matias heard the man say to defendant, " 'Can you do me a favor.' " Matias further testified when the man made this statement to defendant, the man was neither yelling nor appeared angry. Instead, the man walked slowly. As Matias was cutting a branch, he heard a loud gunshot, which scared him. About seven seconds later, Matias heard another gunshot. Matias testified he and the other worker started walking away, looking behind them to make sure no one was coming, because they were afraid they also could be shot.

Witness Fredy Alva Rodriquez testified that he was the other worker at the lot on the day of the shooting; that he had never met Matias or defendant until that day; and that he saw defendant carrying a small black case that day. Rodriquez's job was to take the tree branches that had been cut up a dirt path, to a location beyond where defendant was standing. At some point, a man later identified as Upton came out of the house. Rodriquez testified the man did not appear angry, and he was neither yelling nor cursing.

While on the dirt path carrying branches up the incline, Rodriquez went past the man about three times. Rodriquez estimated he was about three feet away from the man each time he passed with the branches. Each time Rodriquez passed, he noted the man was not yelling, nor did the man tell Rodriquez to stop what he was doing or ask him

13

what he was doing there. Instead, according to Rodriquez, the man just stood on the dirt path.

Rodriquez saw the man talking to defendant while on the path. Rodriquez did not understand what they were saying because he does not speak English. According to Rodriquez, the man did not appear angry while talking to defendant, nor was the man yelling or moving. Defendant, however, was moving his hands side to side, as if he was "nervous." Rodriquez also heard defendant say, "Fucking shit" while he was talking with the man. Defendant, and not the man, appeared angry. Rodriquez testified defendant was speaking louder than the man, and the man was "just listening." Rodriquez did not see the man make any motions that suggested the man was going to attack defendant.

Rodriquez said he was about 10 feet away when defendant shot the man.[4] Rodriquez testified he saw the man fall backwards after the first shot. According to Rodriquez, defendant fired a second shot at the man while the man was laying on the ground. Rodriquez testified he also heard a third shot.

San Diego County Deputy Sheriff Jeremy Collis testified he responded to a call of shots fired at 9:06 a.m. on March 28. The call to dispatch was made by defendant, who told dispatch he had "just shot his neighbor." Deputy Collis and other sheriff's deputies

---

[4] The record shows on cross-examination Rodriquez estimated he was about "75 feet" from where defendant and the man were arguing. Rodriquez also recalled telling detectives he was about "100 to 150 feet" from their location. On redirect, Rodriquez testified that, from his location, he saw the man fall to the ground after being shot by defendant. Although defendant complains Rodriquez was not credible, that was for the jury to decide, not this court. (See *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322 (*Upsher*).)

14

contacted a man later identified as defendant. About 50 yards away, Deputy Collis saw a person lying on a path.

San Diego County Deputy Sheriff Christopher Murray testified that he too responded to the call of shots fired. When he arrived at the shooting scene, Deputy Murray saw a man later identified as defendant talking on his cell phone. There was a black case on the ground next to the man. Deputy Murray approached the victim, later identified as Upton, who was lying in a pool of blood face down on the ground. Deputy Murray noticed a quarter-sized hole in the back of the victim's head. Deputy Murray did not observe any weapons near Upton's body.

San Diego County Deputy Sheriff Timothy Petrachek testified that he saw a man later identified as defendant standing in an "open field" waving as Deputy Petrachek arrived at the scene along with other deputies. Deputy Petrachek contacted the man. According to Deputy Petrachek, the man was calm and unanimated on contact and remained that way over the next 45 minutes to an hour while he was detained. The man also did not show any signs of injury. Deputy Petrachek subsequently arrested the man.

San Diego County Sheriff Homicide Detective Troy Dugal testified he observed two gunshot wounds on Upton, one to the head and another to the abdomen. Upton was lying on what appeared to be a "heavily-traveled" dirt path on the lot. Inside defendant's "box," Detective Dugal found a .44-caliber revolver, ammunition, a small video camera and condoms. On examining the revolver, Detective Dugal found four bullets and two empty casings, suggesting two shots had been fired from that weapon. Detective Dugal

15

found the bullet that entered Upton's abdomen on the ground after they rolled him on his side; also found underneath the victim was a cellphone.

During the investigation, Detective Dugal found a "Glock 27 .40 caliber pistol" and a box of ammunition in the nightstand drawer inside the master bedroom of Upton's residence. No dirt, grass or vegetation or blood was observed on this pistol. Detective Dugal found six bullets in the magazine, but no bullets in the chamber. Detective Dugal determined the lack of a bullet in the chamber suggested the pistol had not been fired, because otherwise a bullet would have been loaded in the chamber as a result of the weapon being "semi-automatic." In addition, the box of ammunition contained 44 bullets, which, when added to the six bullets in the pistol, further suggested to Detective Dugal that the pistol had not been fired because typically a box of ammunition contained 50 bullets.

Computer forensic laboratory specialist Marion Lowe testified he analyzed defendant's computer, which was seized during a search of defendant's home in April 2013. Lowe obtained "positive hit[s]" for " 'best pistol for skeet shooting' " from November 11, 2012; and "low-noise pistols" from October 8, 2011.

Firearm's Examiner Roland Chang testified the .44-caliber Rugar defendant used to shoot Upton was a "single-action" revolver, which meant the operator must manually cock the firearm and then pull the trigger for the weapon to fire. According to Chang, the weapon would not fire if its operator continually pulled the trigger without manually

pulling the hammer back.  Chang determined the expended casings found at the shooting scene were fired from defendant's revolver.

C. *The Defense*

Defendant testified in his own defense.  After purchasing the lot in 2008, defendant initially tried to talk to Bonanno about extending the paved road to defendant's lot and, later, about the fact Bonanno had built a wall that encroached on defendant's lot.

Defendant met Upton and Zeller in 2011.  Initially, their relationship was cordial.  However, over time, their relationship soured.  Defendant testified that he and Upton disagreed about politics.  Upton also disagreed with defendant's decision to cut the trees and bushes growing on the lot.  Upton also told defendant that Bonanno would never allow defendant to extend the paved portion of the road to defendant's lot.

Defendant testified he learned to shoot a weapon while in the Russian military.  He described a "conflict" he had with Upton about a year before in what defendant described was the fatal "accident."  In this instance, Upton became angry after defendant had cut some trees near their residence, along a fence line.  Defendant testified he felt "verbally assaulted" because Upton was a "big man" with a "big voice" and because Upton's body language was "threatening."

When asked what made his body language "threatening," defendant stated Upton came out of the house and told defendant from about 12 to 15 feet away not to cut the trees because Upton wanted them for privacy.  Defendant also stated that he was not concerned Upton would come closer during this conflict; and that, in response, he

17

stopped cutting the trees on the fence line and moved to the main part of the lot to resume his cutting.

According to defendant, Upton also opposed defendant's cutting of the trees on the main part of the lot. Defendant testified that Upton allegedly confronted him about the tree cutting about once a week; that when Upton would do so, he was "hostile"; that Upton showed his hostility through his "body language" and from the "tone" of his voice; and that, although Upton never actually threatened defendant, such as saying he would "kill" defendant, defendant nonetheless felt threatened. As Upton's hostility toward defendant increased, defendant became concerned Upton would "snap." Upton also began cursing at defendant, calling him a " 'fucking Russian' " when asking defendant if he would ever stop cutting down the trees.

Because of Upton's hostility, defendant testified he called the sheriff's department and complained his neighbor was not allowing him to cut trees and bushes on the lot or to walk on portions of the lot that were near his neighbor's residence. Because Upton's hostility toward defendant was escalating during these weekly confrontations, as noted defendant purchased two guns to protect himself from Upton.[5]

Defendant recalled the telephone conversation with Deputy Hill. Defendant testified that, during their October 2012 telephone call, he told Deputy Hill that Upton

---

5    Defendant told detectives during a stationhouse interview that he purchased the .44 revolver because he had researched handguns and determined the .22 semiautomatic pistol was too "small" and because he was concerned he might not be able to shoot Upton in the head with such a small weapon.

18

was " 'yelling' " at, and " 'angry' " with, him. Because Upton had not made a " 'specific threat,' " which defendant described as a " 'promise' " to kill or break defendant's " 'neck' " or " 'legs,' " Deputy Hill told defendant it was a "property dispute" and there was nothing the sheriff's department could do. Defendant also recalled telling Deputy Hill he had purchased a handgun to "protect [himself] from the neighbor" and asking the deputy if there were any "local," as opposed to "state," laws that prevented defendant from carrying the weapon on his own property.

Defendant testified that, about a week after this conversation, he approached two deputies who were outside of his apartment; and that he wanted to speak with the deputies because his telephone conversation with the sheriff's department a week earlier had provided no answer to his request for help with his neighbor and to his question about whether he was permitted under "local" law to carry a weapon while on his property. It was then Deputy Hill identified himself as the sheriff's deputy defendant had spoken with. According to defendant, Deputy Hill merely repeated what he had told defendant a week earlier.

In a confrontation that took place in October 2012 while defendant was shoveling some dirt to smooth the road, Upton approached, told defendant to stop work and said he needed a permit to fix the road. Although it was dark, defendant claimed he saw Upton holding a "short black pistol" in his left hand. At the time, Upton was about 30 feet away from defendant. Defendant testified when he saw Upton with the pistol he felt "something serious" was happening. However, defendant did not call law enforcement

19

because he believed Upton had a right to carry a gun on Upton's "rented property" and because Upton had not made a specific threat against, including pointing the gun at, defendant.

Defendant in his testimony confirmed he had conducted between 22 and 50 searches on the internet regarding firearms, including low-noise pistols. Defendant testified he was interested in buying such a weapon because coyotes were "running on his property," and, if he needed to shoot one, he did not want to alarm the neighbors. Defendant found no such pistols were available.

Defendant testified he carried the .44-caliber revolver with him "all the time" when he was on the lot. Defendant stated he kept the revolver in a gun case, fully loaded with ammunition to hunt " 'deer and bear.' " Defendant also had a video camera in the gun case to record Upton if he did "something" to defendant.

Defendant testified he showed Sampo the revolver because if Upton did "something dangerous" during the survey, defendant needed to be prepared to "interfere, with a weapon." Defendant told Sampo he needed the revolver for "self-protection."

Defendant testified that, despite Upton's protests, he continued to remove the trees and bushes from the lot because they posed a fire hazard and because he wanted to plant some fruit trees. Between January and March 1, 2013, Upton continued to confront defendant about once a week while defendant was working on the lot. According to defendant, Upton's behavior during this period was getting worse because Upton knew

20

defendant had hired a surveyor and because defendant told Upton he was going to tear down the wall Bonanno had built years earlier that encroached on his lot.

On March 21, 2013, defendant called the sheriff's department after the surveyor told defendant some brush located near Upton's residence needed to be removed to complete the survey. Defendant testified that he was present during a portion of the contact between Deputy Abbott and Upton; that Upton asked the deputy if it was legal for defendant to cut the bushes; and that Deputy Abbott told Upton it was legal because the bushes were on defendant's property. In response, Upton told the deputy, " 'I'm pissed he's cutting everything. He's destroying the neighborhood.' " Also angry, defendant tried to defend himself from these accusations. Defendant estimated Deputy Abbott stayed about 20 minutes, and, when the deputy left, things were calm between defendant and Upton.

The day before the shooting, defendant nailed a sign to a large tree near Upton's residence that read, " 'No parking' on the 30 feet road.' " Defendant put the sign up because the following day he intended to cut the bushes and trees in the same area where Upton and Zeller typically parked their cars. The following day when defendant arrived with two workers to remove the bushes and trees, he saw the sign was gone and there were cars parked in the same area in which he intended to work.

Before starting work on the day of the shooting, defendant testified he told both workers he had a "bad neighbor" who was "hostile" and that, if something happens, for the workers not to get involved but to come to him and he would "deal with it." The

21

workers started cutting around 8:30 a.m.  Defendant stood near a fence line in the "middle" of the lot because he was afraid of Upton.  Defendant testified that he was "guarding" the workers who were cutting the trees near Upton's residence; that he was "hiding" from Upton because he was concerned Upton would get upset because of where they were cutting; and that Upton might do something "very dangerous."

A few minutes later, defendant observed Upton "peeking" out the front door.  Concerned, defendant in response opened the gun case that he was holding and put the revolver in his waistband.  Defendant next covered the gun with the long-sleeve shirt he was wearing.  Defendant testified he then decided to carry the revolver on his person because the workers were cutting trees that were close to Upton's front porch.

About five or 10 minutes later, defendant saw Upton step outside and heard him speak to the workers.  Defendant testified that he saw Upton with "something" in his right hand; and that he heard Upton ask, " 'Are you going to cut these trees?' " and inquire whether the workers wanted him to move the cars parked nearby.  After the workers responded, defendant heard Upton say, " 'Give me a few minutes.' "  At that point, Upton started slowly walking in the direction of defendant.

Defendant testified as Upton slowly approached, he cocked the revolver while it was still in his waistband because Upton was looking at some tools lying on the ground, including an axe.  As Upton came nearer, he started yelling at defendant " 'Get the fuck out of here' " and " 'This is not your land.' "  Defendant responded, " 'Are you kidding, this is my land, I will not leave.' "  When Upton was about 10 feet away, defendant

22

testified he saw Upton had a pistol in his right hand that was pointed downward. Defendant in response pulled out his revolver and shot Upton.

Defendant testified he shot Upton because he was in fear for his life. Before firing the second shot at Upton's head, defendant yelled " 'Stop.' " Defendant fired the second shot at Upton's head because Upton continued to walk towards him; he was not sure if Upton had been hit by the first shot, although he doubted he had missed (ostensibly in light of his military training); and that it then went through his mind Upton might be wearing a "bullet[-proof] vest."[6]

In shock, defendant next saw Zeller. Initially, she spoke with the workers, then approached defendant and asked, " 'What have you done?' " Defendant testified he responded, " 'Do not approach me' " as he pointed the revolver at her in a downward direction, "not to [her] head or chest." Defendant further testified when he pointed the revolver at Zeller, it was not to instill "fear" in her but rather to impart "knowledge" of its existence to ensure she would not approach him.[7]

---

[6] During a stationhouse interview, defendant stated that, when he fired the second shot at Upton's head, Upton was either in the process of falling from the first shot or was trying to "avoid" the second shot. Again, any discrepancy in a witness's testimony was a matter for the jury. (See *Upsher*, *supra*, 155 Cal.App.4th at p. 1322.)

[7] When asked on cross-examination why defendant did not show Upton the gun as he had done with Zeller, defendant stated it was against the law to brandish a weapon and he would have been arrested. When asked why defendant did not shoot a warning shot in the air as Upton approached, defendant stated that too was against the law. Defendant admitted that, when he spoke to the 911 operator after shooting Upton, he never mentioned that he saw Upton with a gun. When asked why he also did not inform sheriff deputies responding to the shooting that Upton had a gun, defendant testified he assumed they would "find [it] themselves."

Defendant next walked to the main part of the lot and called 911. The recording of the 911 call was played for the jury. During this call, defendant told the 911 operator that his neighbor had "assaulted" him, and, thus, he shot his neighbor. As defendant waited for law enforcement, he put the revolver back into the gun case.

Witness Jesse Owens testified that he conducted the survey of the lot on March 21, 2013; that, at some point in the morning, Deputy Abbott arrived and escorted them to a particular area where some of the work was to be performed; that he was present when Deputy Abbott contacted Upton; that Upton was "very angry with the whole situation"; but that defendant was calm. Owens noted Upton was cursing and screaming and told defendant, " 'Get the fuck away from me.' "

Owens estimated Upton was screaming for about 15 minutes. However, Owens overheard Upton tell Deputy Abbott that he was not going to hurt defendant, saying he was not "go[ing] down that path." According to Owens, Deputy Abbott explained to defendant what was considered a "legal threat." Based on that definition, Owens testified Upton did not threaten defendant during this confrontation.

Witness Duane Byram testified that he was formerly married to Zeller; that he first met Upton in January 2011; and that he had various "encounters" with Upton in 2011 and 2012, which turned out to be "negative experiences." In one such encounter in May 2011, Byram drove to Upton's residence to pick up his children. As he approached the house, Upton came outside and started yelling at Byram for about 30 or 40 seconds to "get away from his house" and to get the "fuck back to [Byram's] car." Byram went back

24

to his car and waited there until the children came outside. Byram testified he had no idea why Upton came at him like that, as there had been no animosity between them up to that point.

In another incident that took place in June 2012, Byram described how he was leaving Upton's residence when he saw a car coming in the opposite direction. Because the road was narrow and a single lane, Byram pulled off to the side to let the other car pass. As the other car approached, Byram realized Upton was driving. According to Byram, Upton pulled in front of him, blocking him from leaving, and started mouthing some words while pointing at Byram in a "menacing way." Byram testified he was fearful of, and upset with, Upton, particularly because Byram's children were in the car.

In another encounter that took place in about July 2012, Upton and Byram saw each other at a restaurant. According to Byram, when they shook hands Upton repeatedly said, "It doesn't have to be like this" while at the same time refusing to let go of Byram's hand. Byram estimated Upton aggressively shook his hand for about 30 seconds.

Byram also described other incidents, including one in October 2012 when Byram was talking to his former mother-in-law in front of Upton's residence. In that incident, Upton pulled his car behind Byram, who was dropping the children off for the weekend. As Upton approached Byram's car, he pushed Zeller's mother out of the way, came right up to Byram's car window, and started yelling and cursing at Byram for about a minute and a half.

D. *Rebuttal*

Witness Carmen Warner-Robbins testified that she met Upton in 1995; that he worked with her on creating a video about women who were once incarcerated and had returned to living productive lives; and that, while he was "passionate" and "strong in his beliefs," he was neither violent nor a bully. Detective Hillen testified he interviewed defendant for more than two hours after the shooting. During the interview, defendant never told the detectives that he told Upton to stop as Upton approached, immediately before defendant shot Upton. Defendant also did not mention to detectives that he told Upton to stop a second time before he fired the second shot. Defendant also admitted to detectives during the interview that he pointed the gun at Zeller, as opposed to the ground, as he testified at trial. Finally, Detective Hillen confirmed that, although defendant was "very forthright with information" during the interview, he then never mentioned ever seeing Upton with a gun before the March 28 shooting.

DISCUSSION

I

Sufficiency of the Evidence

Defendant contends there was insufficient evidence to support his first degree murder conviction. In making this contention, defendant states the shooting of Upton was a "tragic case . . . precipitated by a series of events over one man's right to clear his property that resulted in that man believing he had to act to save his life." Defendant thus

26

contends the evidence overwhelmingly gave rise to manslaughter, and not murder, as the jury found. We disagree.

A. *Lawful Self-Defense*

1. Guiding Principles

"[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified." (*People v. Clark* (1982) 130 Cal.App.3d 371, 379 (*Clark*), abrogated on another ground as stated in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) However, where the evidence tends to show a situation in which a killing may not be justified, such as in the instant case, "then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact. [Citations.]" (*Clark*, at p. 379.)

Under that standard, we review the "record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citation.] *If the circumstances reasonably justify the jury's finding, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.* [Citation.] For evidence to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value. [Citation.]" (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511, italics added.)

" ' " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 242 (*Salazar*).)

"In making our determination, we focus on the whole record, not isolated bits of evidence. [Citation.] We do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. [Citation.] We will not reverse unless it clearly appears that on no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict. [Citations.]" (*Upsher*, *supra*, 155 Cal.App.4th at p. 1322.)

" 'To justify an act of self-defense . . . , the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him [or her]. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065.)

When the evidence raises the possibility that the defendant acted in self-defense or with another justification, the burden is on the prosecution to prove, beyond a reasonable doubt, that the defendant did not act in self-defense or with another legal justification. (*People v. Rios* (2000) 23 Cal.4th 450, 462; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 703–704.)

28

2. Analysis

Here, we conclude there was more than sufficient evidence in the record tending to show "a situation in which a killing may not be justified" (see *Clark*, *supra*, 130 Cal.App.3d at p. 379) for that issue to be submitted to the jury. (See *ibid.*) We further conclude substantial evidence supports the jury's finding that defendant did not act in lawful self-defense.

Indeed, Deputy Hill testified that, when he spoke to defendant over the telephone on October 31, 2012—after defendant already had purchased at least one if not both guns—defendant then could provide "no articulable reason" why he was "so greatly concerned" for his safety or why he "had gone to the steps of purchasing a firearm and want[ing] to carry it"; that Deputy Hill then warned defendant it was a "very bad idea" to carry a firearm in an argument and that he could be arrested if he made a "bad choice"; that defendant on at least two occasions sought *permission* from sheriff deputies to carry and, if necessary, to use his gun while on the lot, even though defendant admitted to deputies Upton had not been physical "towards him"; that, at or near the same time defendant was unable to provide an "articulable reason" why he was so concerned for his safety, defendant was telling others, including Sampo, that he purchased the .44-caliber revolver because he was being "threatened by his neighbor"; that, when Deputy Abbott was dispatched to the lot a week before the shooting and was given examples by defendant how Upton allegedly had threatened defendant, including that Upton "yelled" at him, Deputy Abbott then determined that Upton had not made any criminal threats

29

against defendant; that, during this contact, defendant admitted to Deputy Abbott there had not been any physical contact between him and Upton; that, also during this contact and in defendant's presence, Upton told Deputy Abbott he would not engage in a physical confrontation with defendant; that, on the day of the shooting, after defendant saw Upton "peek" his head out the front door, defendant then put the fully loaded revolver into his waistband and covered the gun with his long shirt; that, before doing so, defendant told the two workers he had a "bad neighbor" and that, if anything happened, defendant would "deal with it"; that Matias testified Upton was calm and showed no signs of being angry, when, just minutes before the shooting, Upton approached the two workers, said "Hello" and stated he would move the cars so they could continue to trim the trees; that, during this short conversation, Matias did not see Upton carrying anything in his hands, such as a gun; that Upton next started walking slowly, in a nonaggressive manner, up the dirt path, towards defendant; that, as Upton walked up the path, Matias heard Upton say, " 'Can you do me a favor' "; that Rodriquez actually walked past Upton about three times as Rodriquez was carrying tree branches up the dirt path, and, in each instance, Rodriquez noted Upton was neither yelling nor otherwise appeared angry; that Upton was stopped and standing on the dirt path while talking to defendant; that, contrary to Upton, Rodriquez described defendant's demeanor as angry and heard defendant say, "Fucking shit" to Upton; that defendant was speaking louder than Upton; that defendant kept moving his hands side to side in a nervous fashion while talking to Upton; that Rodriquez never saw Upton make any motions or movements which suggested Upton was about to

30

attack defendant physically; that Rodriguez saw Upton fall to the ground after the first shot; that defendant fired the second shot while Upton was lying on the ground; that defendant believed he needed to fire a second shot because Upton might be wearing a "bullet[-proof] vest"; that, after the shooting, Zeller described defendant as "calm and composed" after he pointed the revolver *directly* at her; that Deputy Petrachek testified defendant also appeared calm and unanimated during the 45 minutes he spent with defendant following the shooting; that Upton's Glock pistol was found by Detective Dugal in the nightstand drawer inside the master bedroom of Upton's residence; that no dirt, grass or vegetation or blood was found on the Glock pistol; that defendant, when he reported the shooting, merely said he was "assaulted" by Upton and did not then mention he saw a gun in Upton's hand; that defendant neglected to tell detectives during his stationhouse interviews that he shot Upton because he saw Upton carrying a gun; that defendant bought the .44-caliber revolver and loaded it with ammunition for "deer and bear" because he did not believe the .22-caliber semiautomatic weapon he already had purchased could take down Upton; that defendant felt threatened by Upton and decided he needed to buy two guns for "self-protection" based merely on Upton's "body language" and "tone" when Upton would confront defendant about his continual cutting of trees and bushes on the lot; and that, although Upton had never been physical with defendant, defendant nonetheless was concerned Upton would "snap" during one of their confrontations, which defendant estimated occurred about once a week for about a year (or 52 such encounters) without Upton once "snap[ping]."

31

Based on this substantial evidence, a reasonable trier of fact could find beyond a reasonable doubt that defendant did *not* reasonably believe that (i) Upton was about to inflict great bodily injury upon him when he shot Upton first in the abdomen and next in the head; (ii) the immediate use of deadly force was necessary to defend himself; and (iii) he used no more force than reasonably necessary.

B.  *Imperfect Self-Defense*

The doctrine of unreasonable self-defense, also known as imperfect self-defense, is limited: " 'It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . .  Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.  " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*.' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

Here, we conclude there is substantial evidence in the record from which a reasonable trier of fact could find beyond a reasonable doubt that defendant did not actually believe he was in *imminent* danger of being killed or suffering great bodily injury when he shot and killed Upton.  (See *Manriquez, supra*, 37 Cal.4th at p. 581.)  Indeed, as we noted *ante*, the record shows Upton had *never* threatened defendant with any physical harm during their *myriad* verbal confrontations, which defendant estimated occurred about once a week for over a year.  (See *People v. Aris* (1989) 215 Cal.App.3d 1178,

32

1189 [noting the "criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved"].)

In addition, there is evidence in the record showing Upton was stopped, and not yelling, when he confronted defendant on the dirt path; that it was defendant who had armed himself, appeared nervous and was yelling during the deadly confrontation; and that defendant fired the second shot at Upton's head, as Upton was lying on the ground, as Rodriquez testified, or as Upton was falling to ground after being hit by the first shot to the abdomen, as defendant stated to detectives during a stationhouse interview.

That defendant testified he saw Upton with a gun and/or eying an axe lying on the ground (which *defendant* had brought for the workers to use) as Upton approached—and, as such, he actually believed he was imminent danger of being killed or suffering great bodily injury by Upton—does not change our conclusion.

First, we note there was overwhelming evidence in the record that Upton was unarmed when defendant shot him. Second, it was up to the jury to decide whether Upton was armed and/or whether defendant actually, albeit unreasonably, believed he was in imminent danger of being killed or suffering great bodily injury during the confrontation with Upton. Although the defense argued during closing that defendant held such a belief when he shot and killed Upton, clearly the jury found otherwise, which as trier of fact it was entitled to do. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60

33

[noting a " 'reviewing court neither reweighs evidence nor reevaluates a witness's credibility' "].)

C. *Premeditation and Deliberation*

Defendant further contends there was insufficient evidence to establish the shooting was deliberate and premeditated or was done while lying in wait. We disagree. " 'In the context of first degree murder, premeditation means " 'considered beforehand' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [(*Mayfield*)]) and deliberation means a " 'careful weighing of considerations in forming a course of action . . .' " (*People v. Solomon* [(2010)] 49 Cal.4th 792, 812). "The process of premeditation and deliberation does not require any extended period of time." (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Ibid.*; see *id.* at pp. 767–768 [where defendant wrested the gun from and fatally shot an officer during a brief altercation, the jury could reasonably conclude that "before shooting [the officer] defendant had made a cold and calculated decision to take [the officer's] life after weighing considerations for and against"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [aiming weapon at victims whom shooter believed to be rival gang members constituted sufficient evidence of premeditation and deliberation].)' (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10.)" (*Salazar*, *supra*, 63 Cal.4th at p. 245.)

Here, the record shows on the day of the killing, defendant brought his .44-caliber revolver, fully loaded with "deer and bear" ammunition, to the lot, as he had been doing since he legally obtained the gun months earlier, demonstrating preparation. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [noting the fact the defendant brought a loaded handgun with him on the night the victim was killed indicated the defendant "considered the possibility of a violent encounter"].)

The record also shows that when Upton merely "peeked" out the front door of his house, Upton removed the revolver from the gun case, placed it in his waistband and then used his long shirt to conceal the weapon, which is strong evidence of planning. (See *Salazar*, *supra*, 63 Cal.4th at p. 222 [noting there was evidence of planning when the defendant told an accomplice and a member of the same criminal street gang as defendant to get a gun when they saw the victim, who they determined was a rival gang member, in a parking lot].)

Moreover, defendant testified that he armed himself because the two workers were cutting trees near Upton's residence. Such evidence suggests defendant sought to provoke a deadly confrontation with Upton, supporting motive. Indeed, the record shows that, just a week before the deadly confrontation, defendant had called the sheriff's department because he was concerned Upton would get upset when defendant's surveyor told defendant he needed just *three feet* of vegetation removed near Upton's residence in order to complete the survey. Deputy Abbott responded to that call and, at one point, had to calm both Upton and defendant as they were yelling at each other.

35

What's more, on the day of the killing defendant did not leave the lot after he dropped off the workers and instructed them what he wanted cut, despite the fact he knew Upton likely would get upset. Nor did defendant stand near the two workers as they cut and removed the tree branches near Upton's house. Instead, defendant retreated to the "middle" of his lot and stood behind or near a fence line in an effort to "hide" from Upton. Defendant stood watch, "guarding" the workers from that vantage point. When Upton merely "peeked" out the front door, defendant armed himself outside the presence of Upton and the workers. Such evidence further supports the finding defendant sought to provoke the deadly confrontation with Upton. (See *Salazar*, *supra*, 63 Cal.4th at p. 245 [noting the fact the defendant's accomplice armed himself because the victim looked like a gang member supplied "evidence of motive for provoking a lethal confrontation"].)

Finally, the fact defendant first shot Upton in the abdomen, where it was easier to hit a victim, and subsequently in the head about five to seven seconds letter, and his concession that the .22-caliber gun would have been too small to take down Upton, also support the finding that Upton's killing was deliberate. (See *Salazar*, *supra*, 63 Cal.4th at p. 245; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [noting that the defendant's "firing a shot at a vital area of the body at close range" was indicative of a deliberate intent to kill].)

36

D. *Lying in Wait*

"Section 189 provides, in pertinent part, that 'murder which is perpetrated by . . . lying in wait . . . is murder of the first degree.' Lying-in-wait murder consists of three elements: ' " '(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage[.]' " ' " (*People v. Russell* (2010) 50 Cal.4th 1228, 1244, fn. omitted; see *People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

" ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his [or her] actions or conduct. It is not required that he [or she] be literally concealed from view before he [or she] attacks the victim.' " ' [Citation.] (*People v. Moon* [(2005)] 37 Cal.4th [1,] 22.) As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " [Citation.]' (*People v. Stevens* (2007) 41 Cal.4th 182, 202, fn. omitted.) 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.)

37

Again, we conclude there is substantial evidence in the record from which a reasonable trier of fact could find beyond a reasonable doubt that defendant killed Upton while lying in wait, thus also supporting his first degree murder conviction.

As noted *ante*, just a week before the killing defendant called the sheriff's department because he was concerned there would be a confrontation between him and Upton as a result of his need to trim only three feet of vegetation near Upton's residence. As a result, Deputy Abbott came to the property and, after calming the situation down, both defendant and Upton agreed in each other's presence that there would be nothing physical between them. In addition, as also noted *ante*, defendant claimed he and Upton yelled at each other about once a week, for a period of about a year. As such, according to defendant, there would have been about 52 such confrontations prior to the shooting. Finally, defendant admitted that, during these confrontations, Upton was never physical.

In light of such evidence, and the other evidence also summarized *ante*, including the fact defendant hid the .44-caliber revolver under his shirt even before Upton came outside, we conclude substantial evidence supports defendant's true intent and purpose were concealed for purposes of this element.

We further conclude there is sufficient evidence in the record to support the "watching and waiting" element. Indeed, the record includes overwhelming evidence showing defendant acted insidiously, as opposed to out of rash impulse, as demonstrated by the evidence that, before the shooting, he purchased the .44-caliber revolver because he believed the .22-caliber semiautomatic pistol was not sufficient to protect him from

38

Upton; that, on the day of the shooting, he brought the fully loaded gun to the lot knowing that his cutting of the trees in the area near Upton's residence likely would anger Upton; that he put the gun in his waistband merely because Upton "peeked" out the front door; that, as Upton *slowly* approached defendant, who stood about 100 feet away from where the workers were trimming the trees, defendant did not tell him to stop or otherwise indicate he was armed with a weapon or fire a warning shot into the air; and that defendant instead shot Upton, who, the overwhelming evidence shows, was unarmed, from about 10 feet away, first hitting Upton in the abdomen and next in the head, as defendant had been trained to do while in the military.

We further conclude this same evidence supports the "surprise attack" element of lying in wait. The evidence shows Upton was an unsuspecting victim. Although Upton had a gun in his nightstand drawer, the evidence strongly supports the finding he was unarmed when he slowly approached defendant. There also is no evidence, other than defendant's own self-serving testimony, which the jury rejected, that Upton was about to attack defendant on the day of the shooting.

## II

## Ineffective Assistance of Counsel

### A. *"Fight or Flight" Syndrome*

Defendant contends he was denied effective assistance when defense counsel failed to seek a mistrial after the prosecutor and the defense expert referred to the "fight or flight" syndrome as a "fad." We disagree.

39

1. Additional Background

Pretrial, the prosecution moved to exclude the testimony of Dr. Raymond Murphy, arguing Dr. Murphy did not possess the requisite expertise to testify on a "fight or flight" theory; the basis of his opinion was exclusively derived from the hearsay statements of defendant, as Dr. Murphy did not interview defendant; and the issue of "fight or flight" was not outside the common knowledge of the jury. The record shows the court set an Evidence Code section 402 hearing. Following that hearing, the court denied the prosecution's motion.

At trial, Dr. Murphy generally testified about "fight or flight," noting that it "allows [an] individual to prepare for a dangerous situation, and to either fight to preserve themselves, or flee"; that chemicals in the body are released, including adrenaline and norepinephrine in such situations; that no thinking is required, but rather it is an "automatic response by the nervous system"; and the "fight or flight" response is based on an individual's life experiences. Dr. Murphy noted there was no test he could have performed on defendant to determine whether defendant was undergoing "fight or flight" response on the day Upton was shot. However, Dr. Murphy noted that, if a person was operating under a "fight or flight" response, it was possible for that person "to perceive or see something—a threat, a danger—that may not actually be there" for "survival."

During cross-examination, Dr. Murphy confirmed he was not testifying that defendant was undergoing a "fight or flight response at any given time," including when he shot Upton, because "there's no test for it." Dr. Murphy further confirmed he had not

40

spoken to defendant, he had not read any police reports and he had not read any of defendant's statements. According to Dr. Murphy, an individual under a "fight or flight" response may show symptoms of sweating, palpitations, stuttering, crying and screaming, among other reactions. Conversely, the lack of such symptoms—including perhaps an individual's calmness, as Zeller and Deputy Petrachek observed of defendant *immediately* after the shooting—suggested an individual might not be experiencing "fight or flight."

In any event, as particularly relevant to the instant issue, the following exchange occurred during Dr. Murphy's cross-examination:

"Q. [By the prosecutor]: You mentioned phases of acceptability when you were describing whether—or how this defense is being used currently. Is that what you meant—you were saying 'Phases of Acceptability?'

"A. [By Dr. Murphy]: Yeah, I think so.

"Q.: And I believe you previously even termed it as a 'FAD?'

"A.: 'FAD' in the sense of a defense strategy.

"Q.: One of the other things you talked about as far as contextual, is that if one has a knowledge or familiarity with a dangerous location --

"The Court: Let me see counsel at side-bar."

The record shows, after the unreported side bar, the court admonished the jury as follows:

"All right, ladies and gentlemen, there was a question asked as to whether or not this was considered a FAD.

41

"A FAD can have different contexts, it can have *different meanings*. What I am telling you is that the context within which it was used in this case was inappropriate. That was an inappropriate question for the People to ask, and it gave an inappropriate— left an inappropriate impression with the jury. Therefore, you are to disregard that question, you are to disregard the answer, and you're not to consider it in any way in your considerations of this case." (Italics added.)

Outside the presence of the jury, the following discussion occurred:

"The Court: All right, we did have a discussion off the record where I indicated to counsel I believe that that was a motion in limine the court had previously ruled on, that we were not going to be using that terminology. That counsel could, if he wished, inquire as to recency, or the times under which the defense is presenting itself, but not to refer to it as a 'FAD.' [¶] [Defense counsel], do you wish to address anything further on your redirect, or do you wish to leave it as it is?

"[Defense counsel]: Your honor, at this point I'll leave it as it is. Your honor has, I believe, adequately told the jury to disregard it. [¶] I may ask a follow-up on redirect about: [¶] fight or flight has always existed scientifically, it just—the frequency from which it's used, can vary from year to year, decade to decade—or some such thing.

"The Court: All right. And I think that would be appropriate for you to do."

Next, the prosecutor stated he did not purposely disregard the court's ruling on the use of the "fad" terminology. In response, the court told the prosecutor that the question

42

was inappropriate and that the prosecution was not to "denigrate" any of the defense's defenses. The following exchange then took place:

"[The Prosecutor]: My use of that terminology was not meant as an insult to either counsel or the court.

"The Court: I understand that. It was the *witness* [at] the [Evidence Code section] 402 hearing *who used that term to begin with*, but the point remains relevant: you're not to be doing that in that fashion. All right. [¶] So [defense counsel], you believe that it has, or will be, effectively dealt with?

"[Defense counsel]: Yes, your honor." (Italics added.)

2. Guiding Principles and Analysis

"Defendant has the burden of proving ineffective assistance of counsel. [Citation.] To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.] Moreover, prejudice must be affirmatively proved; the record

43

must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389 (*Maury*).)

" 'Reviewing courts defer to counsel's reasonable tactical decisions . . . , and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926 (*Weaver*).)

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.] Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 380 (*Jennings*).)

Here, defendant can neither establish that defense counsel was deficient for failing to bring a mistrial motion based on the use of the word "fad" nor that he suffered prejudice as a result of the alleged deficiency.

44

First, we note from the record that it was defendant's own expert, Dr. Murphy, who introduced the word "fad" in connection with his testimony at the Evidence Code section 402 hearing regarding the "fight or flight" response.

Second, although the trial court found the use of the word "FAD" inappropriate, we conclude the meaning of this word, when viewed in context, was at best ambiguous. Indeed, the Merriam-Webster online dictionary defines "fad" to mean: "something (such as an interest or fashion) that is very popular for a short time" (<http://www.merriam-webster.com/dictionary/fad> [as of August 30, 2016]). However, Dr. Murphy testified the recognition of the "fight or flight" syndrome or response was made in the early 1900's, suggesting this syndrome or response was anything but a "fad."

Third, in any event, the word "fad" was used only twice within a few seconds of each other, and, immediately after it was used, the court halted the proceedings, went to a side bar and then promptly admonished the jury that the word can have different meanings depending on the context—a point we agree with, as noted—and that it was to disregard the question and the answer in which the word was used. We conclude the trial court properly exercised its broad discretion in handling this issue and when it offered the defense an opportunity to address the issue on redirect. (See *Jennings*, *supra*, 53 Cal.3d at p. 380 [noting the general rule that it is a " 'rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance' "].)

Fourth, we conclude defense counsel made a reasonable tactical decision then to "leave [the 'fad' issue] as it is" because counsel believed the court had adequately addressed it with the jury when the court instructed the jury to disregard the question and answer using the word. (See *Weaver*, *supra*, 26 Cal.4th at pp. 925–926 [noting that, as a court of review, we " 'accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' "].)

On this record, we conclude that, even if defense counsel had made such a motion, it would have been denied. (See *People v. Memro* (1995) 11 Cal.4th 786, 834 [noting the general rule that counsel is not obligated to make futile or frivolous motions].)

B. *Failure to Object to Right-to-Self Defense, Not Contrived Instruction*

Defendant next contends his counsel was ineffective when the defense failed to object to CALCRIM No. 3472. This instruction, as given, provides, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Defendant contends this instruction was improper because there allegedly was "no evidence that at the time Upton was shot, [defendant] initiated a fight or quarrel with the intent to prompt Upton to react." We disagree.

The court must give a requested instruction "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) We independently review whether substantial evidence

46

supported the giving of an instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).)

Here, we conclude there was substantial evidence in the record to support giving CALCRIM No. 3472. Indeed, as we have now noted several times, on the morning of the shooting defendant knew his decision to trim the trees near Upton's residence would likely anger Upton. In fact, defendant warned the two workers of his "bad neighbor," told them he would handle any problems if, or—as the evidence shows in this case—*when*, they arose, and then left the immediate vicinity where they were working and stood about 100 feet away, in the middle of his property, by a fence line.

Defendant also decided to go forward cutting the trees, despite the fact Upton's and Zeller's cars were parked nearby and could be damaged by falling tree branches. Indeed, the day before, defendant had posted a "no parking" sign that ostensibly Upton had taken down and that he clearly had ignored. As we also have noted several times in this opinion, there also was evidence the confrontations between defendant and Upton (allegedly) were increasing in frequency and growing in intensity, as defendant testified. Although defendant believed he had the right to cut down the trees, and even if he did have such a right, a reasonable jury could find his decision to do so was intended to provoke a fight with Upton, one that turned deadly.

What's more, the fact defendant armed himself with the fully loaded revolver and hid that revolver from Upton merely because Upton "peeked" his head out of the front door suggests defendant *expected* a confrontation with Upton that morning and *intended*

47

to use deadly force to end it.  These findings are further supported by evidence that defendant shot Upton without warning while he was unarmed, as he merely stood on the dirt path.

On these facts, we independently conclude the court properly instructed the jury with CALCRIM No. 3472.  (See *Waidla*, *supra*, 22 Cal.4th at p. 733.)  As such, we further conclude defense counsel was not ineffective for failing to object to this instruction.  (See *Maury*, 30 Cal.4th at p. 389.)[8]

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


IRION, J.


PRAGER, J.[*]

---

[8]     In light of our decision on the various errors raised by defendant, we conclude the cumulative error doctrine is inapplicable in this case.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1344.)

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.